OPINION OF THE COURT
Myron E. Tillman, J.
At a hearing on the motions made by and on behalf of Earl Edward Ginnan, Jr., the father of the 21-month-old infant, Stacy Marie Ginnan, the subject of the adoption and custody proceedings, the court makes the following findings of facts:
(1) Earl Edward Ginnan, Jr. is the natural father of Stacy Marie Ginnan.
(2) The petitioner was married to Deborah J. Ginnan on May 21, 1977.
(3) The subject child, Stacy Marie, was born to Earl and Deborah Ginnan on January 6, 1978.
(4) Mr. Ginnan
A. Was indicted under Indictment No. 4312: "the grand jury of the county of steuben, by this indictment, accuse the defendant, Earl E. Ginnan, Jr., of the crime of Murder in the Second Degree, in violation of Section 125.25(1) of the Penal Law of the State of New York, a Class A-l Felony, in that the defendant, on or about the 8th day of July, 1978, at approximately 6:00 a.m., at the Wishing Well Trailer Park in the Town of Lindley, County of Steuben, State of New York, did with intent to cause the death of another person, cause the death of such person, to wit: at the aforesaid time and place, the defendant did cause the death of one Deborah j. ginnan by means of shooting her in the head with a .22 caliber rifle.”
*856 B. Did plead guilty to a reduced charge of manslaughter in the first degree, a violation of subdivision 2 of section 125.20 of the Penal Law.
C. Was sentenced on March 3, 1979, to an indeterminate term of imprisonment at a New York State Correctional Institution at Attica, New York, with a maximum of 25 years.
(5) The subject infant, Stacy Marie Ginnan, was delivered to the physical custody of her great grandfather, Clarence Brant, on or about July 8, 1978, by Joyce Ginnan, the sister of Earl Edward Ginnan, Jr. The infant’s physical custodial arrangements have remained unchanged.
(6) There is before this court:
A. A petition, affidavit, and an order to show cause to determine the custody of Stacy Marie Ginnan made by Earl Edward Ginnan, Sr. and Joyce Ginnan, petitioners v Earl Edward Ginnan, Jr., respondent, and Clarence Brant, respondent, dated September 22, 1978.
B. A petition to intervene in the above custody petition by Gerald P. Brant and Patricia Brant, dated October 12, 1978.
C. An amended petition for adoption by Gerald P. Brant and Patricia Brant, dated April 27, 1979.
D. A motion brought by Earl Edward Ginnan, Jr., respondent, to: 1. sever and dismiss the allegations of permanent neglect in the amended adoption petition, and 2. dismiss the petitions for adoption because: (a) section 111 (subd 2, par d) of the Domestic Relations Law is unconstitutional; and, (b) the father’s consent is lacking.
(7) At a hearing on the motion held on June 26, 1979, this court:
A. Took judicial notice of the file on the indictment and sentencing of Earl E. Ginnan, Jr., entitled People v Earl E. Ginnan, Index No. 40,205.
B. Agreed to dismiss, on consent of all the parties, the allegations of permanent neglect in the amended adoption petition.
(8) The record reveals that the petitioner, Earl Ginnan, assaulted his wife, Deborah, on September 24, 1977, as a result of which Mrs. Ginnan was hospitalized for alleged attempted strangulation.
(9) An amended petition for adoption was brought by the maternal great aunt of the infant and her husband who reside in Florida. The Florida Department of Health and Rehabilita *857 tive Services stated that, inter alia, the Brant family could provide Stacy with warmth, love, and good physical care.
(10) The great grandparents, with whom the infant is currently residing, do not wish to adopt the child nor to have permanent custody.
(11) It was stipulated by all the parties that before going forward with the adoption and custody petitions, the constitutional issues raised by the motions of Earl Edward Ginnan, Jr. should be resolved. The following decision is in response to the afore-mentioned stipulation.
The three issues raised by Mr. Ginnan are of great importance to the law of New York State, and to the basic philosophical attitude of the Legislature. Mr. Ginnan argues that section 111 (subd 2, par [d]) of the Domestic Relations Law and subdivision 1 of section 79 of the Civil Rights Law are unconstitutional because they deny him procedural and substantive due process as guaranteed by the Fourteenth Amendment to the United States Constitution. In addition, he claims that he is denied the equal protection guaranteed him under the United States Constitution and the Constitution of the State of New York.
The procedural due process argument is quickly resolved. The petitioner, Mr. Ginnan, was given notice of the proposed adoption. He has been granted every opportunity to be heard. He has appeared with counsel and argued his position. The court has agreed to consider his arguments. His right to procedural due process has been satisfied by the court’s accommodation without regard to the statute.
Mr. Ginnan’s second argument is that section 111 (subd 2, par [d]) of the Domestic Relations • Law and subdivision 1 of section 79 of the Civil Rights Law deny him substantive due process because they automatically deny him his parental right to refuse to consent to an adoption. The relevant portion of section 111 of the Domestic Relations Law states that in connection with an adoption "[t]he consent shall not be required of a parent or of any other person having custody of the child * * * who has been deprived of civil rights pursuant to the civil rights law and whose civil rights have not been restored”. Subdivision 1 of section 79 of the Civil Rights Law provides, "Except as provided in subdivision two a sentence of imprisonment in a state correctional institution for any term less than for life or a sentence of imprisonment in a state correctional institution for an indeterminate term, having a *858 minimum of one day and a maximum of natural life, forfeits all the public offices, and suspends, during the term of the sentence, all the civil rights, and all private trusts, authority, or powers of, or held by, the person sentenced.” The application of these statutes to Mr. Ginnan depend on the facts of this case.
Mr. Ginnan pleaded guilty to the manslaughter of his wife and, as a result of this, was committed to a State correctional institution for a minimum period of one year and a maximum period of 25 years. At the time of Mr. Ginnan’s conviction and incarceration, his infant daughter, Stacy Marie Ginnan, was six months old. At the time of writing this decision, she is approximately 21 months old. Mr. Ginnan, because of his conviction and sentence to a State correctional institution, falls within the provisions of subdivision 1 of section 79 of the Civil Rights Law and thus within the provisions of section 111 (subd 2, par [d]) of the Domestic Relations Law.
It has long been the history of New York jurisprudence to deny to a felon his civil rights. Latterly, the State has divided those subject to this deprivation into two categories: one, those deprived permanently by being declared civilly dead (Avery v Everett, 110 NY 317); and two, those felons who serve their sentences in a State correctional institution and who are sentenced there for more than one day. The second group of felons have their civil rights suspended for the period of the sentence, regardless of any possible parole, unless those civil rights are restored at the discretion of a court of law upon petition of the felon.
 The petitioner, Mr. Ginnan, correctly claims that parental rights are one of the most basic of rights, and is upheld by case law when he asserts that the presumption of constitutionality which ordinarily attaches to statutes can be rebutted when a constitutional right is fundamental. When dealing with rights so "essential”, "basic”, and "precious”, no presumption of constitutionality attaches to the statute that impinges on these rights. (Kramer v Union Free School Dist., 395 US 621, 627-628; Caban v Mohammed, 441 US 380; Harman v Board of Educ., 300 NY 21.)
The higher the right is regarded, the more jealously the courts guard it against government intrusion. (Stanley v Illinois, 405 US 645.) Thus, the constitutional question " 'come[s] to this Court with a momentum for respect’ ” which is otherwise " Tacking when appeal is made to liberties which derive *859 merely from shifting economic arrangements.’ ” (Stanley v Illinois, supra, p 651.)
In support of his substantive claim, Mr. Ginnan relies heavily on cases dealing with unconsented to termination of the parental rights of unwed fathers and the abandonment or neglect by the parent. Petitioner contends that section 111 (subd 2, par [d]) of the Domestic Relations Law converts his suspension of civil rights into an absolute forfeiture of the fundamental human right to parentage. The recent Supreme Court case, Caban v Mohammed (supra), which dealt with gender-based discrimination under the constitutional equal protection guarantees, refused to deal with the substantive due process as they had decided the case on equal protection grounds. The substantive due process issue raised in Caban is the same as that raised in the case at bar. The real issue, then, is whether unconsented to termination of parental rights without proof of unfitness violates this substantive component of the due process clause.
In the Matter of Ekstrom (24 AD2d 276, 280), the Appellate Division said, "Neither the ties of blood and parenthood nor the moral and temporal interests of the child are absolutes * * * Each case must proceed to decision upon sound and careful consideration of its particular facts, with full recognition of the primacy of parental rights unless and until there shall be submitted convincing proof that they have been substantially eroded by abuse, by misconduct or by circumstances.”
The New York State Legislature, when enacting section 111 (subd 2, par [d]) of the Domestic Relations Law, concluded that a person who came within the provisions of subdivision 1 of section 79 of the Civil Rights Law had, by his own acts, shown himself to have eroded his parental rights to the extent that the State, in its capacity of parens patriae, could act without his consent in the best interests of the child.
It is a prerogative of the State to pass laws when an individual acts contrary to the laws and mores of the State and, in doing so, to deprive that individual of certain rights to protect and preserve the rights of other innocent citizens. It is in the best interests of the people of the State, as a whole, that the criminal laws be preventive and protective in nature and effect.
Mr. Ginnan relies heavily on Stanley v Illinois (405 US 645, supra) in advancing his argument that the statute withholds *860 from convicted felons substantive rights granted to all other classes of parents. Under the Illinois statute, a man who had lived with his natural born children over a period of 18 years had his children taken away from him upon the death of the unwed mother, without his consent or without a hearing or demonstration that he was an unfit parent. Here, in sharp contrast, we are talking about a man who, by his own actions, deprived his six-month-old infant of her natural mother by his own felonious act.
The State has attempted to adopt a careful accommodation of conflicting interests. The course it has steered recognizes society’s fundamental goals of punishment and prevention of crime on the one hand and the promotion of the welfare of its children on the other.
The psychological effect on the child of uxoricide, the murder of one spouse by another, is an area sadly lacking in literature. This court was able to find but one article on the subject (Schetky, Preschoolers’ Responses to Murder of Their Mothers by Their Fathers: A Study of Four Cases, 6 Bulletin of Amer. Academy of Psychiatry and Law, pp 45-57). This article raises as many questions as it answers. It does, however, clearly underline the obvious fact that few, if any, of the problems produced by this terrible act are in any way beneficial to the subject child. Dr. Schetky is convinced that these children need intensive counseling and considers it unlikely that a father who has murdered his wife is ever in a position to resume his role as the psychological parent of the child.
In Quilloin v Walcott (— US —, —, 98 S Ct 549, 555) the Supreme Court said, "We have little doubt that the Due Process Clause would be offended '(i)f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children’s best interest.’ ” Here it is not the State who caused the breakup of the family unit, but the petitioner father. He must bear the responsibility for his own criminal act. His crime is undeniably linked to the child over whom he seeks to retain parental control.
Conflicting interests beyond the power of the Legislature or court to eliminate are inevitably involved in the human relationships with which the statute deals. One interest is that of the parent in the custody of his child in the event of recovery. The other is with the State, in the welfare of the *861 child. Choice cannot be avoided. Indeed, legislative inaction is itself a choice. The Constitution does not forbid selection of the alternative which favors the welfare of the public. (Miller v Schoene, 276 US 272.)
Mr. Ginnan has demonstrated by the act of taking the life of the child’s mother his unfitness. This felony will cause many psychological problems for this infant which may be exacerbated by a continued association with her father. Both the child’s temporal and moral prospects have been dramatically diminished by his crime. Her sole best chance of normalcy is to grow up with a loving, caring family unit.
Petitioner father lays great stress on his fundamental parental rights. The emphasis on parental "rights” has not been without its critics — for example, H. Clark, Law of Domestic Relations in the United States (p 631) stated that "The child is treated like a chattel. The obligations of the parent to behave toward his child, and the child’s needs for material and moral support and a stable environment all get short shift.” Mr. Ginnan’s daughter, too, has fundamental rights, and the State, as parens patriae, has endeavored to deal with these conflicting interests. The law may lack perfection, but within the parameters of conflicting constitutional guarantees presented by this case, this court believes that the best interests of this child are served by the statutory sanctions which deny this petitioner father substantive rights in this proceeding.
Petitioner also claims he is deprived of his constitutional guarantees of equal protection because he is singled out from all other parents and his parental rights are arbitrarily denied.
There is no doubt that the State has the power to deny constitutional rights, even the most basic and fundamental of these rights, in order to preserve the constitutional protection and public welfare of the State as a whole. The rights of individuals are of equal magnitude until they impinge on the rights of another. It is the prerogative of the State to pass laws to deprive an individual of certain rights when an individual acts contrary to the laws and mores or to the accepted principles of conduct within a State. When the State, through the collective wisdom of the Legislature, decides that for the greater good of all a distinction must be drawn between one class of persons and another, it must do so in a manner that will not offend the equal protection clause of the Fourteenth Amendment. In order to do this the classification *862 must be structured in a reasonable manner and it must not be arbitrary. The generalization reflected by the claimed classification must be true of the majority of the members of the class. "A state does not violate the [guarantee] merely because the classifications made by its laws are imperfect.” (Dandrige v Williams, 397 US 471, 485.) "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.” (McGowan v Maryland, 366 US 420, 426; Matter of Doror ”HH” v Lawrence ”II”, 31 NY2d 154, 158.)
There is a presumption that the Legislature has investigated and found facts necessary to support the legislation. (I. L. F. Y. Co. v Temporary State Housing Rent Comm., 10 NY2d 263, 269.)
While the spectrum of crimes committed by felons incarcerated in State correctional institutions in New York State may be broad, they are nevertheless of a serious nature. At the lower end of the spectrum of the more heinous crimes, the felon would have had to have been a second offender in order to be sent to a State correctional institution. Once within the class, all are treated alike and there is no discrimination of one from another. Equal protection of the laws is not denied when all persons are "’treated alike under like circumstance and conditions, both in the privileges conferred and in the liabilities imposed.’” (Matter of Sacharoff v Corsi, 294 NY 305, 312.)
Suspension of civil rights is penal in nature. Historically, "civil death commenced, if any man was banished or abjured the realm by the process of the common law, or entered into religion”. "Banishment, which was afterwards merged in transportation, was inflicted at common law * * * by act of Parliament and later, by statute, by direct sentence of a court in punishment for crime.” (Matter of Lindewall, 287 NY 347, 352.) After the establishment of the United States as a Nation, the sentencing of criminals became a matter for statute only.
In the State of New York, the Legislature has enacted that a sentence of imprisonment in a State prison for any term less than for life, or a sentence of imprisonment in a State prison for an indeterminate term, having a minimum of one day and a maximum of natural life, forfeits all the public offices, and suspends, during the term of the sentence, all the civil rights. It is axiomatic, therefore, that New York State gave serious consideration to the advisability and the need for *863 this additional preventive measure. The court finds that the application of section 79 of the Civil Rights Law is neither arbitrary nor unduly discriminatory, and is a proper exercise of the police power vested in the State in the case at bar.
In applying the equal protection clause, it has been consistently recognized that this amendment does not deny to States the power to treat different classes of persons in different ways. What it does deny is "the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute.” (Reed v Reed, 404 US 71, 75-76.)
 This court finds that the petitioner father has not established the unreasonableness of the legislative enactment (Matter of Anonymous, 79 Misc 2d 280). In addition, there is always a strong presumption that a statute duly enacted by the Legislature is constitutional. For a court to declare a law unconstitutional, the invalidity must be demonstrated beyond a reasonable doubt (People v Pagnotta, 25 NY2d 333, 337). The courts of this State will only declare an act of the Legislature unconstitutional when such unconstitutionality is "clear” (Garcia v Pan Amer. Airways, 183 Misc 258). The facts of this case do not dictate a shift in this burden of proof. The burden of proving that a statute is unconstitutional is on the defendant (Lindsley v National Carbonic Gas Co., 220 US 61; Matter of Fay, 291 NY 198). The court holds that the petitioner has not met that burden of proof.
The court is aware that there may be a fact pattern which could give rise to a contrary decision. However, applying the facts of this case to the statutes, the court finds that section 111 (subd 2, par [d]) of the Domestic Relations Law and subdivision 1 of section 79 of the Civil Rights Law are constitutional.