*901 OPINION OF THE COURT
Howard A. Levine, J.
Before the court are two petitions in which the central issue is whether statutory grounds have been established to dispense with the consent of respondent, the natural father of an infant boy born January 2, 1978, to that child’s adoption by foster parents who have continuously had him in their care since he was three months old. The first petition, filed January 11, 1979, was that of the Schenectady County Department of Social Services (the Department), to commit the guardianship and custody of the child to the Department under section 384-b of the Social Services Law, and thereby to terminate respondent’s parental right to refuse to consent to adoption, on the statutory ground of abandonment (Social Services Law, § 384-b, subd 4, par [b]; subd 5, par [a]). The second petition, subsequently filed, was that of the foster parents, seeking the direct adoption of the child, and setting forth alternative grounds for dispensing with parental consent under two paragraphs of section 111 of the Domestic Relations Law, namely, paragraph (a) of subdivision 2, that respondent “evinces an intent to forego his or her parental or custodial rights and obligations”, and paragraph (d) of subdivision 2, that respondent “has been deprived of civil rights”. The natural mother of the child and wife of respondent has previously executed an absolute surrender for adoption and therefore her rights were not in issue in this proceeding.
Subsequent to the filing of the first petition, the court was advised that respondent was then incarcerated in the State of Texas, arising out of a December, 1978 arrest for aggravated robbery, a felony, for which he was ultimately convicted and sentenced to a term of 5 to 15 years in the Texas prison system in May, 1979. At respondent’s request in an affidavit submitted to the court, and through the co-operation of the Texas prison authorities, the service of his Texas sentence was interrupted and respondent was returned in custody to Schenectady, to permit him to appear and participate fully in the consolidated trial of the two petitions. In his affidavit he represented that if returned to this jurisdiction for the trial, he would voluntarily return to Texas without impeding, that return, le *902 gaily or otherwise, at the conclusion of the trial. Respondent attended all sessions of the trial, except for a brief continuation of the hearing after the close of the main case wherein it was established that he had escaped from custody while boarding an airplane to return to Texas to serve the balance of his sentence. Respondent was later apprehended in the State of Virginia, and there is presently pending in New York State a felony escape indictment against him.
The evidence established that respondent and the child’s mother, during a period of intense matrimonial turmoil, and after a custody contest had been commenced in the Family Court, voluntarily placed the child in foster care in early April, 1978. A plan for visitation and social services to both parents was agreed upon between the parents and the Department, and incorporated in a court order in the custody proceeding on June 6, 1978. The plan provided that respondent would have biweekly visitation rights with the child at his mother’s home and that he was also to attend regular counseling sessions at the Ellis Hospital Mental Health Clinic. It was conceded by respondent that he attended only one appointment at Ellis Hospital, and respondent’s mother testified that he attended only two or, at most, three of the six scheduled visits with the child at her home during the months of April, May, and June, 1978; that in fact, as respondent himself testified, he left Schenectady during about the third week of June, 1978, traveled west, arrived in Texas and remained there continuously, except for a single visit to Schenectady for one week over the Thanksgiving holiday in 1978.
As previously indicated, it was established through his testimony and through a certified judgment of conviction, that he was arrested in December, 1978, and convicted in May, 1979, of aggravated robbery and sentenced to an indeterminate term of not less than 5 nor more than 15 years in the Texas prison system.
The abandonment issue, raised by the Department under section 384-b of the Social Services Law, and the ground for dispensing with parental consent based upon respondent’s intentional relinquishment of parental rights, raised by the foster parents under section 111 (subd 2, par [a]) of the Domestic Relations Law, involved *903 common issues of law and fact, and were resolved on purely factual grounds against the respondent. These issues are discussed in detail in a separate unpublished opinion.
The second ground for dispensing with parental consent set forth in the adoption petition is that respondent is a parent “who has been deprived of civil rights pursuant to the civil rights law and whose civil rights have not been restored” (Domestic Relations Law, § 111, subd 2, par [d]). The applicable section of the Civil Rights Law, section 79, reads as follows: “Except as provided in subdivision two a sentence of imprisonment in a state correctional institution for any term less than for life *** forfeits all [of] the public offices, and suspends, during the term of the sentence, all [of] the civil rights, and all private trusts, authority, or powers of, or held by, the person sentenced.” Comparable provisions had been contained in the New York statutes for many years prior to its current enactment in section 79.
The first objection raised by respondent to the application of section 111 (subd 2, par [d]) of the Domestic Relations Law is that, as a penal statute, section 79 of the Civil Rights Law must be strictly construed to apply only in cases of a conviction in a New York court and sentence to a term in a New York State correctional institution. It is uncontested that the crime of. which respondent was convicted and sentenced would have been a felony under New York law if committed in this State. Also, it was established that the parental and marital rights involved here were all created in New York, the last place of permanent domicile of this respondent. It is true that the civil disabilities upon conviction and sentence contained in section 79 of the Civil Rights Law are generally penal in nature. As will be more fully explained below, however, its application under section 111 of the Domestic Relations Law is part of a general remedial scheme to achieve permanency for children in their parent-child relationships by removing legal barriers to their adoption. Respondent has been rendered neither more nor less incapable of providing a stable and continuous home-and parental care for his child because his conviction and sentence *904 to a 5- to 15-year prison term took place in Texas rather than in New York.
The prevailing case law permits parental consent to be dispensed with in an adoption proceeding on the basis of a non-New York State conviction, providing the crime was the equivalent of a felony under New York law and the sentence was to the equivalent of a New York State prison. (See Matter of Anonymous, 17 Misc 2d 691; Matter of Miller, 179 NYS 181.) Moreover, the New York courts have imposed the loss of other civil rights with respect to out-of-State convictions. (See Nastasi v State of New York, 186 Misc 1051; Matter of Pallas v Misericordia Hosp., 264 App Div 1, affd 291 NY 692; Wilder v Wilder, 181 Misc 1059; Matter of Lindewall, 287 NY 347.) On the basis of the foregoing clear precedent applying section 79 of the Civil Rights Law and its predecessor statutes to non-New York State felony convictions and sentences and because of the underlying purposes of section 111 (subd 2, par [d]) of the Domestic Relations Law, it is therefore my determination that this statutory ground for dispensing with parental consent to adoption applies to respondent’s Texas conviction and sentence.
Respondent has also attacked section 111 (subd 2, par [d]) of the Domestic Relations Law on the ground that the statute is unconstitutional and invalid under the due process and equal protection clauses of the Fourteenth Amendment. Specifically, respondent claims that a statute eliminating the need for parental consent because of incarceration has no rational basis in that it “totally ignores good and positive qualities which may exist in the relationship between parent and child”, that the fact of incarceration may have “absolutely no relevancy to the issue of ‘good parenting’ ”, and may result in the termination of parental rights of an individual who has been a “model parent”, and who has developed strong and permanent ties with his child.
The circumstances of the instant case bear little resemblance to the foregoing suggested applications of the statute. In point of actual fact here, since there has been no contact between respondent and his child since he was three months old, no viable parent-child relationship ex *905 ists. And no such relationship can be created at least until respondent’s earliest possible parole in 1984, without reflecting the various penal effects of his escape from custody following the trial. Indeed, the only meaningful parent-child relationship in this case is the one existing between respondent’s child and the foster parents, the petitioners in this adoption proceeding, who have had his continuous care and custody since the age of three months, and who described in detail the full integration of the child into their family unit. Moreover, as the previous discussion concerning abandonment demonstrates, respondent has been far from a “model parent”.
Respondent’s constitutional attack therefore is at least partially based upon the premise that section 111 (subd 2, par [d]) of the Domestic Relations Law may be applied unconstitutionally to others. In essence, this represents an attack on the facial validity of the statute for “over-breadth”. The leading case concerning review of allegedly overbroad statutes is Broadrick v Oklahoma (413 US 601). There the court recognized that in only rare instances may a person successfully attack a statute because of its possible unconstitutional application to others. The court stated (at pp 610-612): “Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court. * * * In the past, the Court has recognized some limited exceptions to these principles, but only because of the most ‘weighty countervailing policies.’ *** Another exception has been carved out in the area of the First Amendment. It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society. * * * Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial predic *906 tian or assumption that the statute’s very existence may cause others not before the court to refrain from constitutionally protected speech or expression.”
Respondent may gain little solace from the overbreath doctrine, however. To begin with, as stated by the court in Broadrick, the underlying basis of the doctrine having any application here is the “chilling effect” the statute would have in deterring the legitimate exercise of First Amendment rights of parenthood by others. (See Over-breath Review and the Burger Court, 49 NYUL Rev 532, n 5.) This underlying policy of the doctrine has no application whatsoever to the facts of this case. Termination of the parental consent requirements for adoption because of a criminal conviction and sentence can have no chilling effect on anyone’s exercise of parental rights. At most, its only “chilling” effect is as an additional deterrent to criminal activity — hardly a constitutionally protected mode of free expression.
Secondly, as stated in Broadrick v Oklahoma (supra, at p 615), when the form of expression affected by the legislation is conduct, rather than pure speech, the “over-breath *** must not only be real, but substantial as well, judged in relation to the statute’s plainly legitimate sweep.” Here, assuming, arguendo, that the exercise of parental rights falls within the penumbra of activities protected by the First Amendment, surely it pertains to conduct and not pure speech. Just as clearly, there has been no showing that any overbreadth of section 111 (subd 2, par [d]) of the Domestic Relations Law is either real or substantial. Research discloses no reported case decided by the New York courts where the statute has been applied to terminate parental rights of a felon without his consent while ignoring the “good and positive qualities” of the parent-child relationship, or who was a continuing member of a family unit or a “model parent”. Indeed, the Family Court in Matter of Miller (105 Misc 2d 41, 47), declined to apply the statute in the case of a parolee without any further showing, because of his “potential to start to play an active role as a father”. And in a recent case where the court did apply section 111 (subd 2, par [d]) of the Domestic Relations Law to grant an adop *907 tian over the objection of a father who had been sentenced to imprisonment for murdering the child’s mother, the court expressly restricted its decision to the facts of that case. See Matter of Ginnan (101 Misc 2d 853, 863): “The court is aware that there may be a fact pattern which could give rise to a contrary decision. However, applying the facts of this case to the statutes, the court finds that section 111 (subd 2, par [d]) of the Domestic Relations Law and subdivision 1 of section 79 of the Civil Rights Law are constitutional.” (Emphasis added.)
Finally, a reading of Quilloin v Walcott (434 US 246) and Caban v Mohammed (441 US 380), the most recent decisions by the United States Supreme Court concerning parental rights under both substantive due process and equal protection, establish that the constitutional issues are to be governed on the basis of the application of the statute in the case at hand, rather than on the basis of facial validity or invalidity. In Quilloin, the court upheld an application of a Georgia statute denying veto power over an adoption to the father of an out-of-wedlock child whom he had not previously legitimated. Mr. Justice Marshall, writing for a unanimous court, stated (at p 255): “Whatever might be required in other situations, we cannot say that the State was required in this situation to find anything more than that the adoption, and denial of legitimation, were in the ‘best interests of the child’ ”. And in Caban, dealing with the validity of another subdivision of section 111 (subd 1, par [c]) of the Domestic Relations Law, Mr. Justice Stevens’ dissenting opinion states (at p 416): “The fact that an unusual application of the state statute has been held unconstitutional on equal protection grounds does not necessarily eliminate the entire statute as a basis for future legitimate state action.”
Thus the constitutional issues raised by respondent will be determined on the basis of the application of the statute to the actual facts of the instant case.
The issue therefore is, when there has been a separation of parent from child at early infancy, followed by an extended prison sentence of the father and an integration of the child into the family unit of foster parents, can the State validly terminate the father’s parental rights *908 and grant an adoption to the foster parents without a specific finding of unfitness, based solely upon the child’s best interest?
Concededly, respondent’s legal status as parent and his expectancy at some future date of exercising and enjoying the actual functioning of parenthood fall within those “fundamental rights of family life” protected by the Fourteenth Amendment under Supreme Court decisions beginning with Meyer v Nebraska (262 US 390) and Pierce v Society of Sisters (268 US 510), and including Moore v East Cleveland (431 US 494); Cleveland Bd. of Educ. v LaFleur (414 US 632); Wisconsin v Yoder (406 US 205); Griswold v Connecticut (381 US 479), and Roe v Wade (410 US 113), all under substantive due process; and Stanley v Illinois (405 US 645); Zablocki v Redhail (434 US 374); and Caban v Mohammed (supra), under equal protection.
The constitutional analyses under the equal protection and due process clauses are not dissimilar.[1] Where fundamental rights are involved, the claimed statutory infringement through regulation or classification is subject to “strict” scrutiny (Shapiro v Thompson, 394 US 618 [equal protection]), or “careful” scrutiny (Moore v East Cleveland, supra [due process]). In the court’s more activist decisions, that scrutiny places the burden on the governmental authority to show a “compelling state interest” (Roe v Wade, supra [due process]; and Shapiro v Thompson, supra [equal protection]); and the means selected in the statute to achieve the legislative goal must be “narrowly drawn to express only the legitimate state interests at stake” (Roe v Wade, supra, p 155); or it must appear that there is no other reasonable alternative for achieving the legislative goal which has less severe impact on the fundamental rights involved (Shapiro v Thompson, supra).
The more recent cases decided by the Burger court have perhaps slightly softened review in fundamental rights of *909 family life cases, to inquire whether a “legitimate” State interest is involved, and whether there is a “substantial relation to [an] important state interest” (Caban v Mohammed441 US 380, 388, supra [equal protection]), or whether the means selected are “appropriate or necessary” (Moore v East Cleveland, supra) or “needlessly, arbitrarily, or capriciously impinge upon * * * [a] vital area of * * * constitutional liberty” (Cleveland Bd. of Educ. v LaFleur, supra, p.640 [due process]).
Commentators have described the approach as being one of analyzing and balancing the particular State interests involved and its actual or likely impact upon the particular private right infringed. (See Dixon, The Supreme Court and Equality: Legislative Classifications, Desegregation, and Reverse Discrimination, 62 Cornell L Rev 494; Gunther, The Supreme Court 1971 Term — Foreword: In Search of Evolving Doctrine On a Changing Court: A Model for Newer Equal Protection, 86 Harv L Rev 1; Henkin, Privacy and Autonomy, 74 Col L Rev 1410, 1430; and Karst, The Freedom of Intimate Association, 89 Yale LJ 624, 651-652.)
A careful reading of the range of modern cases decided under both the equal protection and due process clauses reveals at most an evolving, slightly different emphasis rather than any major shift. What the court has always done is to examine closely the statute involved, without according it the benefit of any presumption of validity, to balance the importance to the State of the goals of the legislation against its impact upon the particular right of the individual, and to require a showing of the necessity, appropriateness and reasonableness (i.e., nonarbitrariness) of the statutory means of furthering those goals.[2]
Using the foregoing criteria for review, I find that applying section 111 (subd 2, par [d]) of the Domestic Relations Law to the facts of the instant case does not violate either substantive due process or equal protection. The *910 compelling State interest involved is revealed in the text of the statute and its recent legislative history. It is the achievement of permanency in the parent-child relationship for children whose natural parents are unable or unwilling to provide continuous, stable and long-term care. Although comparable provisions have long been included in the Domestic Relations Law, present section 111 (subd 2, par [d]) was part of a comprehensive statutory recodification of the law of adoption and termination of parental rights contained in the Domestic Relations Law, Social Services Law and Family Court Act, enacted as chapter 666 of the Laws of 1976, proposed by the New York State Temporary Commission on Child Welfare following a study of the legal obstructions to achieving permanency for children in foster care. (See Barriers to Adoption, New York State Temporary Commission on Child Welfare [1976].) As part of chapter 666, the Legislature enacted a preamble to a new section 384-b of the Social Services Law in which it expressly found “that many children who have been placed in foster care experience unnecessarily protracted stays in such care without being adopted or returned to their parents or other custodians. Such unnecessary stays may deprive these children of positive, nurturing family relationships and have deleterious effects on their development into responsible, productive citizens. The legislature further finds that provision of a timely procedure for the termination, in appropriate cases, of the rights of the natural parents could reduce such unnecessary stays.” (Social Services Law, § 384-b, subd 1, par [b].)
The foster care system in New York State was the subject of the Supreme Court’s decision in Smith v Organization of Foster Families (431 US 816). The majority opinion extensively discusses the deleterious effects of protracted foster care with copious citations to authorities in the modern literature of child welfare. (See in particular its citations to Goldstein, Freud and Solnit, Beyond the Best Interests of the Child [1973]; Sherman, Neumann and Shyne, Children Adrift in Foster Care: A Study of Alternative Approaches [1973]; Mnookin, Foster Care — in Whose Best Interests?, 43 Harv Educ Rev 599; Eis *911 enberg, The Sins of the Fathers: Urban Decay and Social Pathology, 32 Amer J of Orthopsychiatry 5; Fanshel, Status Changes of Children in Foster Care: Final Results of Columbia University Longitudinal Study, 55 Child Welfare 143.) In substance, the professional studies have established that the placement of children in foster care is commonly not temporary or transitional, as had always been assumed; rather, most children who go into foster care remain in that “limbo” status for extended periods; that commonly they will be subject to multiple foster care placements; that the resulting lack of permanent stable parent-child relationships is emotionally damaging on a long-term or permanent basis, seriously affecting their ability to function as useful, adjusted and law-abiding adolescents and adults; and that the indefinite maintenance of the nearly 50,000 children in foster care in New York State today represents a serious financial burden on the public purse.
Viewed either from the historical tradition of the State’s special parens patriae responsibility for children, or from the facts of modern life concerning the enormous financial and social cost of maintaining children in foster care status, the State’s interest in achieving permanency for children whose parents are unable or unwilling to provide stable long-term continuous care is nothing if not “compelling”. Moreover, the State’s interest in permanency for children is directly applicable to the infant who is the subject of the instant proceedings, who will otherwise remain in the limbo of foster care for at least the first six years of his life.
A proper weighing of goals, interests and means in the instant case requires not only the balancing of respondent’s fundamental right to continued legal ties to his child as against the State’s interest in achieving permanency, but other factors as well. First, while respondent’s legal interest in the child is clearly cognizable as fundamental, the importance of that interest is surely somewhat weakened by reason of the absence of any functional parent-child relationship in actual fact. The Supreme Court, in several cases, has recognized that the constitutional recognition of the parent-child relationship derives, *912 not only from legal and biological ties, but also the intimate association and emotional attachments within the family unit. As stated in Smith v Organization of Foster Families (supra, at p 844): “Thus, the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in ‘promoting a way of life’ ***, as well as from the fact of blood relationship.” And in Quilloin v Walcott (434 US 246, supra), the court held that the father’s consent to an adoption was not constitutionally required, because the child was already a part of a different, existing family unit. Similarly, in Caban v Mohammad (441 US 380, 393, supra), the court held only that New York’s section 111 of the Domestic Relations Law was unconstitutional in dispensing with the consent to adoption of an out-of-wedlock child where the father had “established a substantial relationship with the child”. Second, the status of respondent which now permits the State to grant an adoption of his child without his consent under the statute was self-created. Respondent’s conviction and sentence as a serious violent felony offender was of his making, and was not a condition such as race, national origin or gender, over which he had no control. The Supreme Court has also recognized that the liberty interests of prisoners are not entitled to any preferred status, but are subject to a variety of restrictions and impositions because of competing State substantive and administrative interests. (See Meachum v Fano, 427 US 215.)
A proper balancing of goals, interests and means here also requires consideration of the private interests of the particular child who is the subject of this proceeding and of the foster parents to whom he has become attached over a period of nearly two years of foster care and who now desire, through adoption, to obtain legal confirmation of the close family ties which have been formed during that period. Children, too, are “persons” within the meaning of the Fourteenth Amendment, and their individual interests are entitled to constitutional protection. (See Matter of Gault, 387 US 1; Tinker v Des Moines School Dist., 393 *913 US 503; Planned Parenthood of Missouri v Danforth, 428 US 52.) To be sure, the interests of the foster parents here to be free from threats of disruption to the intimate relationship which has developed with the child is not equivalent to the rights of legal parents in a similar situation. Nevertheless, it has been held that the relationship does constitute a “liberty interest” in the constitutional sense. The words of the decision in Smith v Organization of Foster Families (431 US 816, 844) are apt to the instant case: “No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship. At least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family. For this reason, we cannot dismiss the foster family as a mere collection of unrelated individuals.”
In summary, taking into account the facts and circumstances of the instant case, including the absence of any functional relationship between respondent and his child, the substantial future period before respondent could begin to create such a relationship, and the close familial ties between the child and the foster-adoptive parents, permitting that adoption to take place in the child’s best interest without respondent’s consent is a necessary, appropriate and reasonable means of achieving the State’s objective of permanency. And granting the adoption without respondent’s consent bears a substantial relation to the legitimate State interest in achieving such permanency.
Even under the strictest scrutiny of the statute as applied here, no alternative means to achieve the State’s objective can be conceived, which would still preserve respondent’s legal ties to the child. Clearly, to superimpose a constitutional requirement of a preliminary finding of parental unfitness, as suggested by respondent, would not accomplish any greater protection of respondent’s *914 right, without sacrificing or unduly postponing achievement of the goal of permanency. Unfitness envisages a relative disability to perform parental functions. Here, for much of the most crucial stage of this infant’s child development, respondent’s disability is absolute. The Court of Appeals, in Bennett v Jeffreys (40 NY2d 543, 546), recognized that “extraordinary circumstances”, other than unfitness, including “unfortunate or involuntary disruption of custody over an extended period of time”, may justify State intervention in the parent-child relationship. Aside from instances of objectively identifiable physical or mental disabilities; the fitness or unfitness of a parent is only realistically ascertainable in the context of a history of actual parental functioning within the family unit. Respondent, through his own acts, rendered impossible any such inquiry in the instant case. Moreover, as pointed out by Judge Fuchsberg’s concurring opinion in Bennett v Jeffreys (supra, at p 554), parental unfitness and best interests are not discrete categories, but are closely interrelated and overlapping. An inquiry into the best interests of the child must of necessity include some examination of the relative fitness or unfitness of the parent whose rights are at stake. Lastly, with respect to the necessity to make a finding of unfitness, the Supreme Court’s decision in Quilloin v Walcott (434 US 246, supra) appears to be consistent with the holding of the Court of Appeals in Bennett, that circumstances other than unfitness may exist where an adoption may constitutionally be granted over a parent’s objection, based solely on the child’s best interests.
Accordingly, I find that the application of section 111 (subd 2, par [d]) of the Domestic Relations Law in the instant case, to dispense with parental consent because of respondent’s loss of civil rights is valid under both the due process and equal protection clauses of the Fourteenth Amendment.
On the basis of the record, and the statutorily required report of investigation submitted by the Schenectady County Department of Social Services, the evidence is clear and convincing that granting the petition for adop *915 tian herein is in the best interests of the child. I have, therefore, signed the proposed order of adoption.

. See discussion in the concurring opinion by Judge Stewart in Zablocki v Redhail (supra).

. For illustrations of the court’s analysis of goals, interests and means, see Adding-ton v Texas (441 US 418, 425, 431) and Moore v East Cleveland (431 US 494, supra), particularly its adoption of Justice Harlan’s analysis in his dissenting opinion in Poe v Ullman (367 US 497, 547).