OPINION OF THE COURT
Bernard M. Bloom, S.
In the course of the instant proceeding for adoption of a six-year-old boy in which the petitioners are his natural mother and her husband, a constitutional question is raised by the respondent, the natural father. Respondent is serving a sentence in a State correctional institution, a circumstance which, under section 111 (subd 2, par [d]) of the Domestic Relations Law, makes his consent to the proposed adoption of his son unnecessary as one whose civil rights are suspended pursuant to section 79 of the Civil Rights Law. As applied to him, he argues, the statute denies rights to due process and equal protection of the law and is violative of his son’s Federally guaranteed associational rights as well.
*706 Petitioners originally sought to dispense with the necessity for obtaining the natural father’s consent to the adoption on the distinct and independent ground of his alleged abandonment, that is, failure to visit and communicate with the child or his legal custodian for a period of six months without demonstrated inability to have done so (see Domestic Relations Law, §111, subd 2, par [a]). When they made their somewhat belated, though not untimely, motion to have the need for respondent’s consent to the adoption dispensed with on account of his felony status during trial of the abandonment allegation before a law assistant referee, decision was reserved pending a determination whether abandonment had been established which, if favorable to petitioners, would have made a ruling on the merits of the second ground academic. Reservation of decision on the constitutional challenge provided advantages even in the event such abandonment were not shown. First, it permitted time for notification of the Attorney-General of the attack upon the statute as required by law so as to invite his intervention in its defense should it become necessary (see CPLR 1012). Second, the trial of the abandonment doubled as an opportunity for the natural father to be heard to oppose the adoption on the ground that it would ill serve the child’s moral and temporal interests. While the Domestic Relations Law entrusts to the Surrogate’s discretion the decision whether to afford such a hearing to those whose civil rights are suspended (see Domestic Relations Law, § 111, subd 3), it has been held that a felon who has not abandoned his child has an absolute due process right to be heard even if his consent is not requisite to the adoption (see Matter of Anonymous, 104 Misc 2d 985, 989, and cases cited therein). Third, the evidence concerning the history of this respondent’s relationship with his son produced during the abandonment trial could, conceivably, prove instructive from the point of view of the needs of the child quite irrespective of the father’s right to be heard. It is possible, in other words, that evidence offered in defense of an abandonment allegation might, aside from vindicating a given respondent, reveal the existence of a parent-child bond sufficiently strong to make it apparent that the prospect of irreclaimable substi *707 tution of a new parent by adoption is inappropriate or, at least, premature.
In the instant case, the respondent natural father did, in fact, successfully defend the allegation of abandonment (see Matter of Gerard F. C., NYLJ, Nov. 26,1982, p 17, col 1). While the uncontroverted evidence was that he had not visited with his son for approximately one and one-half years before he began to serve his prison sentence in November, 1980, this court found that he had made sufficiently continuous efforts to do so which had been frustrated largely by deliberate actions of the mother, most notably, removal of the child to Florida immediately prior to the date weekly visitation with the father was to begin by order of the Family Court. Thus, the constitutionality of the afore-mentioned provisions of the Domestic Relations Law and Civil Rights Law as applied to respondent must be reached.
The challenged statutes have a long history. Attainder of all civil rights, including the right of parental management of children, was an immediate consequence of judgment following conviction of any felony at common law, when every felony was a capital crime (see, generally, Avery v Everett, 110 NY 317). In this State, civil death was retained as an incident of felony status, both for offenses which continued to be punishable by death and those for which life imprisonment had been substituted in 1796. After the advent of less severe terms for certain felonies, suspension of civil rights for the duration of the sentence was substituted for civil death (see Act, Recommendation and Study Relating to Capacity of Certain Convicts to Sue, 1948 Report of NY Law Rev Comm, p 159). In 1873, when the first general enactment establishing a procedure for adoption of children became law, it was expressly provided that the consent of a natural parent who was deprived of civil rights was unnecessary (L 1873, ch 830). Remarkably, despite the century in which the concept of loss of civil rights has been applied to the adoption concept, no appellate court of this State has as yet addressed the question of its constitutionality. (One has, however, recently applied it in a proceeding for termination of parental rights under *708 section 384-b of the Social Services Law [Matter of Tina Marie W., 87 AD2d 988].) Nevertheless, this court does not write upon a fresh slate by any means as opinions of nisi prius courts on the subject fairly abound.
As in the instant case, in several of the more recent decisions the argument was made that dispensing with the felon’s consent violates procedural due process. That argument has been rejected where, as here, a hearing was afforded to the felon at which he was free to present evidence to show that an adoption would not best serve the child’s moral and temporal interests (see Matter of Anonymous, supra; Matter of Ginnan, 101 Misc 2d 853; Matter of Anonymous, 79 Misc 2d 280). Respondent’s suggestion that his right to procedural due process is abridged in that his lack of veto power over the adoption deprives him of any realistic opportunity to retain his parental rights as a result of the hearing is mistaken. He enjoyed the assistance of appointed counsel and, in addition to a full and fair chance to air any objections he might have to the character, ability or wherewithal of the proposed adoptive father to raise the child in the company of the natural mother, he had the opportunity by means of his own testimony and otherwise to establish the history of his own relationship with his natural son. As afore-mentioned, the relative remoteness or intimacy of that natural parent-child relation is keenly pertinent in establishing whether or not the proposed adoption would be advantageous to the child or whether his best interests would be better served by preservation of the natural parent’s parental status looking toward eventual resumption of custody or visitation. While the court has located no reported cases wherein a parent deprived of civil rights has prevailed on the basis of a best interests hearing, none of them posed a close question as each almost invariably was shown to have ignored his parental rights and obligations from the child’s infancy or to have relinquished them long before institution of the adoption proceedings. Thus, it can hardly be concluded on the basis of such cases that the disability imposed by the challenged statutes has alone sufficed to deprive those affected of a meaningful opportunity to prevail.
*709 The equal protection and substantive due process aspects of the constitutional attack merit more serious consideration. Both of these asserted grounds for overturning section 111 (subd 2, par [d]) of the Domestic Relations Law, plus an additional ground not raised by the instant respondent, that of the Eighth Amendment’s proscription of cruel and unusual punishment, were rejected by Surrogate Brewster (Matter of Anonymous, 104 Misc 2d 985, supra), and former Surrogate Bennett (Matter of Anonymous, 79 Misc 2d 280, supra), after discussion at some length, on condition, however, that best interests hearings be afforded. Each opinion emphasized that the extended disruption of normal parent-child contact occasioned by incarceration of the parent for an indefinite period creates competing interests beyond legislative or judicial power to eliminate. If the law were not to permit the parental rights of the felon to be terminated so as to allow an adoption in the child’s best interests, that fact would itself embody a choice favoring the parent over the child. The Constitution does not forbid selection of the alternative which promotes the public welfare.
The same line of reasoning was adopted in Matter of Ginnan (101 Misc 2d 853, supra). Though Judge Tillman was careful to point out that he found section 111 (subd 2, par [d]) of the Domestic Relations Law constitutional as applied to the felon before the court, who had taken the life of the mother of the infant child, but was aware (p 863) that “there may be a fact pattern which could give rise to a contrary decision”, the thrust of the opinion is strongly indicative that such fact patterns are few and far between. While recognizing that the right of parentage is a fundamental one carrying “ ‘a momentum for respect’ ” (Stanley v Illinois, 405 US 645, 651), it is not absolute and it is the prerogative of the State to deprive those who violate its laws of even fundamental rights when necessary to preserve the rights of other innocent citizens. He noted that the Legislature in enacting the challenged provision had concluded that those who fell within its confines had, by their own acts, shown themselves to have eroded their parental rights to the extent that the State in its capacity as parens patriae could act in the best interests of the child *710 without their consent. Characterizing this course as an attempt by the State to adopt “a careful accommodation of conflicting interests”, he found substantive due process had not been abridged (p 860). Similarly, his treatment of the equal protection vein lends no aid to the instant respondent (p 862): “While the spectrum of crimes committed by felons incarcerated in State correctional institutions in New York State may be broad, they are nevertheless of a serious nature. At the lower end of the spectrum of the more heinous crimes, the felon would have had to have been a second offender in order to be sent to a State correctional institution. Once within the class, all are treated alike and there is no discrimination of one from another. Equal protection of the laws is not denied when all persons are ‘“treated alike under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed.” ’ (Matter of Sacharoff v Corsi, 294 NY 305, 312.)”
Respondent relies principally upon the decision from the Family Court, New York County, in Matter of Miller (105 Misc 2d 41), in which section 111 (subd 2, par [d]) of the Domestic Relations Law was held unconstitutional as applied to parolees and on certain language in Matter of Jonathan E. G. (107 Misc 2d 900).
In Miller (supra), in the context of a petition brought by a child care agency to free a child for adoption under section 384-b of the Social Services Law, Judge Fogarty laid considerable stress on the fact that the strict scrutiny standard of review is appropriate to legislation which impinges upon the right of a natural parent to raise his or her child (see Caban v Mohammed, 441 US 380; Pierce v Society of Sisters, 268 US 510). As release from confinement to parole represents a judgment that the offender is a candidate for rehabilitation, he reasoned, retention of a punitive measure such as continued withholding of the legal rights accorded other fathers is inconsistent with the prospect of a successful return to society. Indeed, release of a prisoner before the completion of his or her full term is intended as an incentive for reunion with family members and the making of a stable and permanent home with them. Accordingly, as applied to parolees, section 111 *711 (subd 2, par [d]) was held not rationally related, and impermissibly broader than necessary, to serve the admittedly compelling State interest of providing children with stable and permanent homes. Judge Fogarty also noted (p 49) that, in contrast to the respondent in Ginnan (supra), who had killed the child’s mother, the respondent before him had been sentenced for the crime of attempted robbery in the third degree, which he characterized as “totally unrelated to his status and duties of a father”.
While Matter of Miller (supra) is of considerable interest, the instant respondent is not among those who would benefit by this court’s adherence to its holding. He is still incarcerated, serving an indeterminate sentence of 3Vá to 10 years and will first become eligible for parole, according to his testimony, in December of this year. It is, of course, not feasible for this court to hold this matter in abeyance in anticipation of a parole which may never be granted. And Miller itself allowed (p 48) that as to felons still incarcerated, the granting of an adoption without a finding of unfitness may meet both strict scrutiny and valid State purpose tests. The present case is factually dissimilar in other salient respects as well. Miller concerned a petition brought by a child care agency seeking termination of the natural father’s parental rights, the mother having theretofore voluntarily surrendered the child. Judge Fogarty was careful to explain that he had weighed the interests of the respondent natural father against those of possible adoptive parents yet unknown, suggesting that greater weight should be afforded to the interests of custodial “parents” who had established ties with the child vis-a-vis those of the parent deprived of civil rights. It is an instance of the latter type which is presented here.
Invocation of Matter of Jonathan E. G. (supra) is likewise unavailing to respondent despite its intimation that the disability created by section 111 (subd 2, par [d]) might be unconstitutional as applied to certain individuals not then before the court. In Jonathan E. G. the respondent felon was found to have abandoned his child and, in a contest against the foster parents who sought to adopt concurrently with the termination of parental rights at the behest of the foster care agency under section 384-b of the Social *712 Services Law, the court refused to permit him to attack section 111 (subd 2, par [d]) on the basis that it may be impermissibly broad as applied to others, specifically parolees, “model parents” and those whose convictions are for crimes bearing no relevance to the parent-child relationship. As noted by the court, its reluctance to overturn the statute based on mere possible facial overbreadth accords with the case-by-case approach employed by the United States Supreme Court in the analogous case of Quilloin v Walcott (434 US 246 [upholding a Georgia statute denying fathers of children born out of wedlock the right to block their adoptions unless they had legitimated them by marriage or formal acknowledgement as applied to a father who had never lived with the child nor furnished substantial support]). As is the case with Ginnan (supra), it is doubtful that the author of Jonathan E. G. thinks section 111 (subd 2, par [d]) overbroad even in every case of a “model parent” whose conviction was unrelated to the parent-child relationship. As long as he or she remains incarcerated for an indefinite period, the opinion seems to indicate no feasible alternative is available to the State to preserve the paternal rights of the felon without sacrificing or unduly postponing achievement of the legitimate State objective of full integration of children into permanent, stable homes. In any event, we cannot say that the instant respondent qualifies as a “model parent” even if the Constitution requires that such parents’ veto power over adoptions of their children be retained. Though the felony for which he is imprisoned, armed robbery, was not directed against the child or the family, it was one which bespoke a willingness to endanger human life and, as such, we cannot say it is without relevance to the question of his fitness as a parent.
The Supreme Court of the United States has said that the fundamental liberty interest of a natural parent in the care, custody and management of his child does not “evaporate” simply because he has not been a model parent or lost custody temporarily (Santosky v Kramer, 455 US 745). However, this court does not find it incompatible to hold, as does Jonathan E. G. (supra, p 911), that the importance of that fundamental legal interest is “somewhat weakened by *713 reason of the absence of any functional parent-child relationship in actual fact”. Respondent has not lived with his now six-year-old son since shortly after his second birthday and last visited him a month or two thereafter. He protests that he, along with his entire family, was close to his son while he lived with the natural mother and that he was prevented by the mother from continuing to see him after their breakup. The mother’s flight from this jurisdiction immediately after he had obtained an order from the Family Court permitting visitation, he argues, evidenced disrespect for the judicial system and for the child’s right to see his father and should not furnish a factual predicate for diminution of his parental rights. In Matter of Bennett v Jeffreys (40 NY2d 543), the Court of Appeals did indeed voice a general policy to the effect that unlawful procural of custody by kidnapping, violence or flight from the jurisdiction should be deterred and, consequently, that the lawless should not prevail on the basis that the passage of time has made correction inexpedient. The court’s final sentence on that subject, however, was cautionary: “Yet, even then, circumstances may require that, in the best interest of the child, the unlawful acts be blinked [at]” (p 550, citing to Matter of Lang v Lang, 9 AD2d 401, 408-410, affd 7 NY2d 1029).
It was, in fact, in that very case, Bennett v Jeffreys (supra, p 544), that the Court of Appeals articulated for the first time that certain “extraordinary circumstances” provided sufficient cause to deprive a parent of custody in the best interests of the child apart from parental surrender, abandonment or unfitness. Though such extraordinary circumstances should be “narrowly categorized” (p 545), the specific example given of what that term includes is “unfortunate or involuntary disruption of custody over an extended period of time” (p 546), an example drawn from the scenario before the court in which a 23-year-old single woman attempted to have the custody of her eight-year-old daughter wrested from an older woman to whom she had entrusted the child at birth. This court recognizes that custody matters are distinct from the irretrievable loss of parental rights through adoption and does not mean to imply that an “extraordinary circumstances” category has *714 now been judicially engrafted upon the statutes regulating adoption as an additional ground for termination of parental rights; on the contrary, the Court of Appeals specifically noted in Bennett v Jeffreys (p 551) that if the mother’s petition for custody were denied, she would still retain the power to block an adoption. Nonetheless, it seems proper to draw on Bennett v Jeffreys’ reasoning, as did Jonathan E. G. (supra), to conclude that the involuntary but extended disruption of custody attending a sentence to a State correctional institution does properly trigger the best interests of the child test as this precise category is specifically provided by statute.
There has been a prolonged interruption of the natural father’s custody and visitation here. Neither is the cessation of contact between the natural father and his son entirely attributable to blameworthy conduct by the mother; a considerable portion must be laid at the feet of respondent himself. After all, respondent was, and still is, married to a woman other than the natural mother and is the father of a minor child born to his marriage. When he chose to cohabit with the natural mother of the child here in question, whom he was not free to marry, he faced the not unforeseeable risk that should a separation occur, she might well be in a better position to prevail in a custody dispute with respect to any children who might be born to them. Certainly the sentence he now serves for commission of armed robbery, the consequences of which he is presumed by law to know, is the product of his own moral turpitude. Accordingly, we find that the mother’s conduct has not been sufficiently egregious to warrant a denial of the adoption petition on public policy grounds.
The child has been integrated into a new family unit consisting of his natural mother, his stepfather and a child born of their marriage and it is doubtful that the child has any recollection of his natural father. Respondent failed to substantiate his alleged hearsay information concerning domestic violence in the adoptive home. The preadoption investigation was favorable to the petitioners and the guardian ad litem for the child recommends that the adoption be granted.
*715 Therefore, upon all of the evidence, the court finds that the best interests of the child require that an order of adoption be entered.
Deep appreciation is extended to Samuel M. Price, Esq., who graciously and gratuitously contributed many hours of service as guardian ad litem for the adoptive child.